<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JUAN DAVID VASQUEZ-URIBE, | : | |
| | : | Civil Action No. 12-6873 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**WIGENTON**, District Judge

Before the Court is Petitioner Juan David Vasquez-Uribe's ("Petitioner") motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 ("Motion"). The Government filed an Answer to Petitioner's Motion on September 13, 2013. (ECF No. 8.) Petitioner filed a reply on December 11, 2013. (ECF No. 11.) For the reasons stated below, this Court DENIES Petitioner's Motion and DECLINES to issue a certificate of appealability.

## <u>FACTUAL AND PROCEDURAL HISTORY</u>

In February 2001, the Drug Enforcement Administration (DEA) obtained judicial approval to intercept conversations transmitted by a cell phone used by Jesus Antonio Gil. Shortly after overhearing Gil pledge to fax property deeds as "guarantees" for an impending drug transaction, law enforcement officers began to conduct surveillance of a Bergenfield, New Jersey residence belonging to co-conspirator Johnny Toro. On February 8, 2001, after DEA officials had spotted Carla Perez arriving at and departing from Toro's residence, a Fort Lee police officer stopped Perez's vehicle at the DEA's request. Perez gave consent for a vehicle search, and the police

discovered two large duffel bags containing 95 kilograms of cocaine. Toro testified that Gil then used a payphone to relay the news of this drug seizure to Vasquez–Uribe, whom Gil referred to as "el patron" ("the boss") and who reputedly owned the confiscated package. *See United States v. Vasquez-Uribe*, 426 F. App'x 131, 133 (3d Cir. 2011). (*See also* ECF No. 1-4, Pet. Motion at Exhibit B, Presentence Investigation Report ("PSR") at ¶¶ 15-20.)

Following the seizure of the cocaine, Gil and Vasquez–Uribe engaged in a series of cell phone conversations that were intercepted by the DEA. These conversations revealed that Vasquez–Uribe had claimed that Gil owed him $1.8 million for the seized cocaine. Vasquez-Uribe acknowledged he had received the deeds to the Colombian property Gil had pledged as collateral, and he also disclosed that an additional 205 kilograms had safely entered the United States. Vasquez-Uribe further threatened to prevent Gil's wife from leaving Colombia. Vasquez–Uribe visited the properties covered by the transferred deeds and told Gil he would retain Gil's farm until the debt was paid down but had no interest in assuming possession of a less attractive piece of property, which he dismissively dubbed "the small one." With an eye on facilitating repayment, Vasquez–Uribe agreed to give Gil 50 kilograms of cocaine on consignment, but Gil was arrested before the transaction was consummated. *Vasquez-Uribe*, 426 F. App'x at 133. (*See also* PSR at ¶¶ 27-31.)

On November 30, 2001, a federal grand jury issued a four-count indictment against Vasquez–Uribe, charging him with: (1) conspiracy to import 300 kilograms of cocaine into the United States from Colombia, in violation of 21 U.S.C. § 963; (2) importation of 300 kilograms of cocaine into the United States from Colombia, in violation of 21 U.S.C. §§ 952, 960(a)(1) and 960(b)(1) and 18 U.S.C. § 2; (3) conspiracy to distribute and possess with intent to distribute 300 kilograms of cocaine, in violation of 21 U.S.C. § 846; and (4) distribution and possession with

2

intent to distribute 300 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.

At the time the indictment was issued, Vasquez–Uribe's whereabouts were unknown to law enforcement officials in the United States. DEA New Jersey sent a request to the International Criminal Police Organization (Interpol) for the issuance of a "Red Notice" to alert all member countries that the United States had issued an arrest warrant for Vasquez-Uribe and intended to pursue extradition. DEA New Jersey subsequently learned that DEA Colombia and Colombian authorities were jointly investigating Vasquez–Uribe and his associates. Due to the ongoing joint investigation, DEA Colombia asked that DEA New Jersey decline its pursuit of extradition at that time, to which DEA New Jersey consented. Accordingly, United States law enforcement conducted alternative means to locate Vasquez–Uribe internationally for the purpose of detaining Vasquez-Uribe if he were to travel within the United States. The United States Marshals Service entered Vasquez–Uribe's name into the National Crime Information Center database to ensure prompt notification if Vasquez-Uribe was arrested by an agency with access to that system. DEA New Jersey also continued to cooperate with the National Central Bureaus of Interpol member countries in an active effort to locate and apprehend Vasquez–Uribe. *Vasquez-Uribe*, 426 F. App'x at 133-34.

In August 2006, DEA New Jersey learned Vasquez–Uribe had reentered Colombia, and it was confirmed that Colombian authorities would arrest him upon receipt of a provisional arrest warrant. United States law enforcement quickly sent a request for a provisional arrest warrant to the embassy in Colombia, and Vasquez–Uribe was arrested there on or about October 6, 2006. The United States then submitted a formal extradition application within 60 days of Vasquez-Uribe's arrest, and the Colombian government approved the extradition on or about June 18, 2007.

Vasquez–Uribe was surrendered to the United States in August 2007, and he made his initial appearance before the United States District Court for the District of New Jersey on August 8, 2007. Over the course of the next year, Vasquez–Uribe assented to multiple continuances as he made bona fide efforts to cooperate with the government and underwent a change in counsel. *Id*. at 134. (*See also United States v. Vasquez-Uribe*, Case # 2:01-cr-00768-SDW, at ECF Nos. 11, 17, 18, 21, 22, and 26.)

Vasquez–Uribe waived his right to a jury trial. On December 23, 2008, this Court, serving as trier of fact, found Vasquez–Uribe guilty on the two conspiracy counts and not guilty on the corresponding substantive counts. On July 22, 2009, this Court sentenced Vasquez–Uribe to two concurrent 30–year terms of imprisonment. Vasquez–Uribe timely appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. On May 4, 2011, the Third Circuit affirmed Vasquez-Uribe's sentence, holding that the evidence was sufficient to support the convictions, and that Vasquez-Uribe was not deprived of his right to a speedy trial as guaranteed under the Sixth Amendment. *United States v. Vasquez-Uribe*, 426 F. App'x 131 (3d Cir. 2011). Vasquez-Uribe thereafter sought a rehearing, a rehearing en banc, and a recall of the mandate, which were denied on October 5, 2011. He did not file a petition for a writ of certiorari before the Supreme Court.

On November 5, 2012, Vasquez-Uribe timely filed this § 2255 motion.[1] He raises claims of ineffective assistance of counsel, namely, (1) failure to call two material witnesses at trial who

---

[1] A federal conviction becomes final when certiorari is denied or when the time for filing such petition expires. Under Rule 13.1 of the Supreme Court Rules, Vasquez-Uribe had 90 days from entry of judgment or denial of a rehearing petition to file his petition for certiorari. *See Kapral v. United States*, 166 F.3d 565, 571 (3d Cir. 1999). Vasquez-Uribe's conviction became final on January 3, 2012, 90 days after his petition for rehearing was denied on October 5, 2011. His petition was filed on November 5, 2012, well within the one-year statutory period.

allegedly would have exonerated Petitioner, and (2) failure to object to the admission of testimony at trial that contained hearsay statements. Vasquez-Uribe also asserts that he was denied his Sixth Amendment right to confront witnesses against him when the Court allowed the Government to use inadmissible hearsay. (ECF No. 1, Petition at 8-19.) Vasquez-Uribe further requests an evidentiary hearing. (*Id*. at 19-20.) The Government filed a response on September 13, 2013. (ECF No. 8.) Petitioner filed his reply on December 11, 2013. (ECF No. 11.) With his reply, Vasquez-Uribe attached a statement allegedly executed by Walter James Taylor, one of the co-conspirators, purporting to be an affidavit despite the fact that it was not notarized.

## **LEGAL STANDARD**

A prisoner in federal custody under sentence of a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence" upon three grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" or (3) "that the sentence was in excess of the maximum authorized by law." 28 U.S.C. § 2255(a).

In considering a motion to vacate a defendant's sentence, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (internal quotation marks and citation omitted). "It is the policy of the courts to give a liberal construction to pro se habeas petitions." *Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010). The Court may dismiss the motion without holding an evidentiary hearing if the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. *See* 28 U.S.C. § 2255(b); *Liu v. United States*, No. 11–4646, 2013 WL 4538293, \* 9 (D.N. J. Aug. 26, 2013) (Simandle, J.) (citing *Booth*, 432 F.3d at 545–46).

**DISCUSSION**

A. <u>Ineffective Assistance of Counsel Claims</u>

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. VI. In order to succeed on his claims alleging ineffectiveness of counsel, Vasquez-Uribe must satisfy the two prong test of deficient performance and resulting prejudice as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Premo v. Moore*, 562 U.S. 115, ----, 131 S.Ct. 733, 739, 178 L.Ed.2d. 649 (2011) (holding that "[t]o establish ineffective assistance of counsel, a defendant must show both deficient performance by counsel and prejudice"). First, Vasquez-Uribe must show that his counsel's performance (viewed as of the time of counsel's conduct) was inadequate and "fell below an objective standard of reasonableness," in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Id*. at 687–688. Vasquez-Uribe must then show that the deficient performance prejudiced the defense. In other words, Petitioner must prove that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. *See also Rainey v. Varner*, 603 F.3d 189, 197-98 (3d Cir. 2010).

The U.S. Supreme Court has reiterated that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the Supreme Court has admonished lower courts that the "*Strickland* standard must be applied with scrupulous care...." *Harrington v. Richter*, 562 U.S.86, ----, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). "It is 'all too tempting' to 'second-guess counsel's assistance after conviction

or adverse sentence,'" however, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id*. at 788 (quoting *Strickland*, 466 U.S., at 690) (internal citations omitted). In order to pass the prejudice prong, Petitioner must show, with reasonable probability, that but for the counsel's professional incompetence, the outcome of the proceeding would have been different. *Strickland* 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." *Id*. at 693.

As stated above, Vasquez-Uribe must show both deficiency of performance and prejudice to prevail on an ineffective assistance of counsel claim under *Strickland*. Thus, given the interplay between *Strickland* and § 2255, if Petitioner shows both elements of *Strickland*, he satisfies the requirements of § 2255. *U.S. v. Travillion*, 759 F.3d 281, 289 (3d Cir. Jul. 7, 2014). However, in a claim of ineffective assistance of counsel, which has both a deficiency and prejudice prong, the court may address the prejudice prong first "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Id*. at * 4 (citing *Strickland* 466 U.S. at 697).

1. *Failure to Call Two Material Witnesses*

Vasquez-Uribe first argues that his counsel, John Caruso, Esq., failed to call his two co-conspirators as witnesses at trial. These two witnesses were Walter Taylor, also known as Junior Familia, and Jesus Antonio Gil. Petitioner argues that these witnesses would have contradicted the testimony of Johnny Toro.

The Government contends that Petitioner's trial counsel was not ineffective because Vasquez-Uribe has not demonstrated that counsel's performance was defective rather than sound trial strategy, and because even if these two witnesses had been subpoenaed, Petitioner did not

7

produce evidence, other than mere speculation, that the witnesses' testimony would have affected the outcome of trial.

The crux of Petitioner's argument is based on his claim that he was not a participant of the February 8, 2001 phone call involving Gil, as testified by Toro, and thus was not part of the conspiracy to import, distribute, and possess with intent to distribute 300 kilograms of cocaine. Vasquez-Uribe contends that had his counsel attempted to call or subpoena Taylor, Taylor would have confirmed that Petitioner had not met Taylor until March 3, 2001, while they were both in Columbia, and therefore, could not have been involved in the February 8th phone call. Vasquez-Uribe obtained an un-notarized statement purportedly from Taylor, who stated that, on March 3, 2001, Taylor met Vasquez-Uribe for the first time in Cali, Columbia "to see if he could collect the money from a shipment of drugs that was seized on February 8, 2001," and that Taylor introduced Vasquez-Uribe to Gil over the phone for the first time on that date, March 3, 2001. (ECF No. 11, Affidavit of Walter James Taylor, dated October 26, 2013, at ¶¶ 5-8.)

In a similar vein, Vasquez-Uribe argues that Gil should have been called as a witness at trial because "he would have discredited Toro's testimony and proven that Uribe was not the owner of the drugs, was not the boss, and was not on the phone because at the time of the February 8th arrest Uribe did not know any of these persons and that Uribe only met Walter Taylor in Columbia on March 3rd, 2001." (ECF No. 1, Petition at 14.) Petitioner offers no proof or evidence to support this conjectured testimony.

Nevertheless, even if these witnesses might now testify as Vasquez-Uribe speculates, this Court finds that trial counsel's decision not to call these two witnesses was a strategic assessment of the case based on the facts and investigation known at that time. For instance, during trial, Caruso had informed this Court that Taylor was incarcerated in Texas and declined to testify on

behalf of Vasquez-Uribe. Caruso stated that he made several attempts, through an investigator and through Taylor's counsel, to discuss the case with Taylor, but Taylor was uncooperative. (Dec. 12, 2008 Tr. at 101-02; Dec. 17, 2008 Tr. at 70-71; Dec. 18, 2008 Tr. at 118-19.) Near the end of trial, Caruso reiterated his attempts to reach Taylor and told the Court that "[i]t [was] too risky" to subpoena Taylor to testify at Vasquez-Uribe's trial when Taylor adamantly refused to testify. (Dec. 22, 2008 Tr. at 8-9.)

As to Gil, Caruso advised the Court that Gil apparently had left the United States in 2004 and his whereabouts during Petitioner's trial were unknown.[2] (Dec. 12, 2008 Tr. at 101.) Thus, Gil had disappeared well before Vasquez-Uribe's trial, as even Vasquez-Uribe was absent from this country when he was indicted in November 2001, and was not located and eventually extradited to the United States until 2007. Moreover, even if Gil could have been located outside of the United States, he would have been beyond the subpoena power of this Court.

Clearly, as demonstrated above, the trial record is replete with evidence of Caruso's efforts to investigate or interview the two witnesses (co-conspirators) as requested by Vasquez-Uribe. The record shows that Taylor was plainly uncooperative and thus too risky to call as a witness, and Gil had disappeared from the country. Under *Strickland*, there is a "strong" presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Branch v. Sweeney*, 758 F.3d 226, 234 (3d Cir. 2014) (quoting *Burt v. Titlow*, --- U.S. ----, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013). Further, it is well settled

---

[2] This Court notes that, at the beginning of trial, Caruso had stated on the record that he believed Gil was incarcerated in a federal prison across the country and had never been interviewed. (Dec. 10, 2008 Tr. at 7.) AUSA Marion Percell, however, informed the Court that Gil was not incarcerated and his whereabouts were unknown to the Government. (*Id*. at 9.) Two days later Caruso confirmed to the Court that Gil had left the United States and was unavailable. (Dec. 12, 2008 Tr. at 101.)

9

that attorneys are not obliged to call every witness suggested to them by their clients. The decision of which witnesses to call to testify is strategic, and therefore left to counsel. *See Diggs v. Owens*, 833 F.2d 439, 446 (3d Cir. 1987), *cert. denied*, 485 U.S. 979 (1988). Attorneys may choose only witnesses who are likely to assist their theory of the case. *Reed v. Gavin*, Civ. No. 13–4257, 2014 WL 645232, *5 (E.D.Pa. Feb. 18, 2014). Moreover, the "Sixth Amendment does not require that a criminal defense attorney leave 'no witness unpursued.'" *Lewis v. Blaine*, Civ. No. 00–3274, 2010 WL 753811, at *8 (E.D.Pa. Mar.1, 2010) (quoting *Jacob v. Horn*, 395 F.3d 92, 122 (3d Cir.2005)). The decision of which witness to call "is precisely the type of strategic decision which the Court in *Strickland* held to be protected from second guessing." *United States v. Merlino*, 2 F. Supp.2d 647, 662 (E.D.Pa. 1997). *See also Marshall v. Cathel*, 428 F.3d 452, 462–63 (3d Cir. 2005) ("Where an attorney's actions are the result of 'strategic choices' this presumption of reasonableness ... is essentially irrebuttable."). Therefore, based on the record as ascertained at trial, this Court finds that Caruso exercised reasonable professional judgment in deciding not to subpoena Taylor to testify at trial. Further, because the record confirms that Caruso investigated Gil's whereabouts and discovered that Gil was outside the United States and the Court's subpoena power, Petitioner cannot establish that Gil was available to testify. Consequently, this Court concludes that counsel did not render deficient performance necessary to establish an ineffectiveness of counsel claim by failing to call Taylor and Gil as witnesses at trial.

Moreover, even if this Court were to conclude that Caruso may have been deficient in this regard, Vasquez-Uribe also fails to demonstrate prejudice as a result of such alleged deficiency. *Strickland* requires this Court to determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S.

at 694. Vasquez-Uribe need not establish that his "counsel's deficient performance more likely than not altered the outcome of the case," rather he ought show only "a probability sufficient to undermine confidence in the outcome." *Branch*, 758 F.3d at 238 (quoting *Grant v. Lockett*, 709 F.3d 224, 235 (3d Cir. 2013) (internal quotation mark omitted)). This is not a stringent standard, and in fact, is "less demanding than the preponderance standard." *Branch*, supra (citations omitted). However, the Supreme Court recently observed that "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Harrington*, 131 S.Ct. at 792 (internal quotation marks omitted). Indeed, the Supreme Court cautioned that the "likelihood of a different result must be substantial, not just conceivable." *Id.* Thus, for purposes of determining Strickland's prejudice prong here, this Court must consider whether there was a substantial likelihood that Taylor's and Gil's testimony would have changed the outcome of Vasquez-Uribe's trial.

At best, had Gil and Taylor testified, they would have discredited Toro's testimony that Gil spoke on the telephone with Vasquez-Uribe on February 8, 2001. However, Toro did not testify that Gil spoke with Vasquez-Uribe, only that Gil spoke with a person Gil referred to as "Uribe, el patron," which meant "the boss," and that that person was the owner of the drugs. (Dec. 9, 2008 Tr. at 141-142.) Toro also testified that he spoke with the person on the phone who had a Columbian accent, but did not otherwise identify the person "el patron" as Petitioner. Toro further testified that he never met the man on the telephone, did not know what he looked like and could not identify his voice after nearly eight years later. Indeed, Toro could not identify voice recordings of Vasquez-Uribe as the same voice he spoke with over the telephone on February 8, 2001. (*Id*. at 144-149.) Thus, Toro never confirmed that the man he spoke with on February 8, 2001 was Vasquez-Uribe.

More significantly, however, whether Vasquez-Uribe was the man on the telephone on February 8, 2001, was not the determinative issue in Petitioner's trial. Vasquez-Uribe's defense to the conspiracy charges centered on his claim that the conspiracy to import or distribute cocaine had terminated on February 8, 2001, when 95 kilograms of the cocaine shipment had been seized by law enforcement before Vasquez-Uribe became involved as an "independent agent in debt collection" for the seized cocaine in his private scheme to steal the collected funds from "the real owners of the drugs." *Vasquez-Uribe*, 426 F. App'x at 134-35. The Government argued that there was no doubt that Vasquez-Uribe had collected deeds from Gil knowingly for "the purpose of collecting on a drug debt arising from that 95 kilograms of cocaine that was seized on February 8th," and that Petitioner's efforts in this drug debt collection can be deemed as his furtherance of the conspiracy, which was payment for the drugs that were seized. (Dec. 23, 2008 Tr. at 38, 47-48.)

This Court, as trier of fact, found that the conspiracy did not terminate when the cocaine reached the United States and was seized on February 8, 2001, but rather, "the conspiracy continued up until payment was going to be received for the drugs." (*Id*. at 103.) Indeed, this Court observed that "the objective of the conspiracy was not only to bring drugs in the United States and distribute those drugs, but the objective was also to get paid for those drugs, and that was the common objective . . . ." (*Id*.) This Court did not mention the February 8th telephone call or comment on the credibility of Toro's testimony in reaching a decision on Petitioner's guilt. Instead, this Court focused on the credibility of Vasquez-Uribe's testimony, commenting that Vasquez-Uribe's purported deception in stealing the collected debt was not credible, and ultimately finding that Vasquez-Uribe's alleged secret purpose was irrelevant because Vasquez-Uribe admitted in his trial testimony that "he got involved in this entire arrangement with the

12

purpose of viewing property and ultimately collecting on the debt." (*Id*. at 103-05.) This Court then found Vasquez-Uribe guilty of the two conspiracy counts and not guilty of the two substantive counts. (*Id*. at 106-07.)

The Third Circuit affirmed Vasquez-Uribe's conviction on the conspiracy counts, rejecting Petitioner's same arguments presented in his defense at trial. The Court of Appeals noted that "a conspiracy may have multiple objectives, and the conspiracy endures beyond the attainment of its principal goal if 'other subsidiary objectives' have yet to be achieved." *Vasquez-Uribe*, 426 F. App'x at 135 (citations omitted). For instance, as related to Petitioner's case, the Court of Appeals commented that where one object of the criminal conspiracy was illicit gain, namely, the collection of money in exchange for drugs, the criminal conspiracy "embrace[s] the means ordinarily employed to accomplish that intended result." *Id*. (citations omitted). The Court of Appeals further observed that "an individual who did not participate 'in the conception of the conspiracy' may nevertheless join belatedly and become responsible for the actions that antedated his arrival should he knowingly 'co-operate in the common effort to obtain the unlawful results.'" *Id*. (citation omitted).

Keeping this legal framework in mind, the Court of Appeals found that there was sufficient evidence to support this Court's guilty verdict:

> The District Court defined the conspiracy to which Vasquez–Uribe was a party as one in which the participants sought "not only to bring drugs in the United States and to distribute those drugs, but ... also to get paid for those drugs," and it found Vasquez–Uribe had joined the enterprise "during the lifetime of the conspiracy, sharing a unity of purpose and intent to achieve the objective of receiving payment for those drugs, once they had been imported." The recorded conversations revealed Gil arranging to fax copies of the pledged securities prior to the drugs being seized, evidence that demonstrates the parties considered payment to be a core facet of the conspiracy regardless of whether the delivery proved successful. Enlisted to collect on the drug debt, Vasquez–Uribe played an integral role in actualizing this aspect of the scheme.

13

> Much as how the defendant's attempts to recoup a drug-related debt were found to be "in furtherance" of the charged conspiracy in *Knowles* despite having wholly occurred after the boat and drugs had been seized, Vasquez–Uribe's comparable efforts placed him squarely within the scope of the charged conspiracy. As did the Eleventh Circuit in *Varella*, we conclude the District Court here acted properly in finding the conspiracies continued beyond the date of the seizure as the conspirators attempted to decipher what had transpired and as Vasquez–Uribe sought to defray his losses by appropriating the collateral that had been pledged on the debt and by broaching the possibility of an additional importation.
>
> Thus, by insinuating himself into an ongoing conspiracy through seeking to obtain payment for the seized cocaine, Vasquez–Uribe exposed himself to the charges on which he was convicted. The evidence was sufficient to demonstrate that Vasquez–Uribe was cognizant of the nature of the conspiratorial scheme and that the scheme entailed receiving payment for the seized drugs. Rather than simply commiserating about a foiled conspiracy that had already met its demise, Vasquez–Uribe helped pursue the conspiracy to its logical end by attempting to collect on the drug debt. *See Zolicoffer*, 869 F.2d at 773; *James*, 494 F.2d at 1026. That he may have joined the enterprise after its inception and without having participated in the actual importation or distribution is not determinative under the conspiracy statutes at issue. As evidenced by the wealth of intercepted conversations introduced as government exhibits, Vasquez–Uribe—aware of his confederates' illicit aims—became a witting participant in an active conspiracy. He did not disclose his purported ruse to fleece Gil and Taylor out of their money at any point during the course of his extended efforts to cooperate with government officials, and the District Court was entitled to discredit his testimony in the face of contrary evidence. *See United States v. Stuart*, 22 F.3d 76, 80 (3d Cir.1994) ("The question of intent was a simple credibility decision, and [the defendant] lost.").

*Vasquez-Uribe*, 426 F. App'x at 1136-37.

Therefore, this Court concludes that Vasquez-Uribe has not established a reasonable probability that the testimony of Gil and Taylor, if obtained, would have altered the outcome of his trial in any way. Having failed to show either deficient performance by counsel or ensuing prejudice, Petitioner's claim of ineffectiveness of counsel on this issue is denied as completely lacking in merit.

2. *Failure to Object to Inadmissible Hearsay*

In this claim, Vasquez-Uribe contends that counsel was ineffective for failing to object to the admission of testimony by witness Johnny Toro regarding the hearsay statements made by

14

Antonio Gil, in violation of Petitioner's Sixth Amendment right to confront witnesses against him. However, this Court deemed Toro's testimony concerning his conversation with Gil on February 8, 2001 as admissible hearsay pursuant to Federal Rule of Evidence 801(d)(2)(E) because Toro's testimony involved statements made by co-conspirator Gil. Specifically, Rule 801(d) provides that co-conspirator statements are not hearsay if "[t]he statement is offered against an opposing party and ... was made by the party's coconspirator during and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Moreover, for the reasons stated in the next section of this Opinion, this Court finds no violation of Vasquez-Uribe's Sixth Amendment right to confront co-conspirators Gil and Taylor at trial, which determination further renders this ineffectiveness claim meritless.

B. *Confrontation Clause Claim*

Vasquez-Uribe principally argues that this Court's admission of Toro's testimony regarding "hearsay" statements made by co-conspirator Gil violated his Sixth Amendment right to confront witnesses against him at trial. (ECF No. 1, Motion at 13-19.) As discussed above, the statements about which Toro testified had been made by Antonio Gil and were admitted as coconspirator statements pursuant to Fed.R.Evid. 801(d)(2)(E). Antonio Gil, the person petitioner Vasquez-Uribe was trying to hold responsible for the loss of the 95 kilograms of cocaine, was indisputably a coconspirator, and Gil's statements about that cocaine and the seizure of it were equally indisputably in furtherance of the conspiracy. Thus, the statements were properly admitted.

This Court also finds no violation of the Sixth Amendment's Confrontation Clause. The Sixth Amendment guarantees the right of an accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has long held that the Confrontation Clause

15

bars the use of the confession of a non-testifying criminal defendant in a joint trial to the extent that it directly inculpates a co-defendant. *See Washington v. Sec'y Pa. Dep't of Corr.*, 726 F.3d 471, 475 (3d Cir.2013) (citing *Bruton v. United States*, 391 U.S. 123, 126 (1968) (holding that "a criminal defendant is deprived of his right to confrontation when a non-testifying codefendant's confession names him, regardless of whether the judge has given the jury a limiting instruction"). Furthermore, where the declarant does not appear at trial, the Confrontation Clause bars the introduction of a testimonial, out-of-court statement unless the declarant is unavailable at the time of trial and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004); *see also Davis v. Washington*, 547 U.S. 813, 821 (2006). The Confrontation Clause is not implicated, however, if there is no testimonial statement by an out-of-court declarant. *See Davis*, 547 U.S. at 821 (finding only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause"); *United States v. Berrios*, 676 F.3d 118, 127 (3d Cir. 2012) (noting we must first determine "whether the contested statement by an out-of-court declarant qualifies as testimonial"); *see also United States v. Green*, 543 F. App'x 266, 270 (3d Cir. 2013).

Indeed, the Third Circuit emphasized that the Confrontation Clause has no application to out-of-court non-testimonial statements. *Berrios*, 676 F.3d at 126 (citations omitted). "[T]he Supreme Court [in *Crawford*] observed that, at its core, the Confrontation Clause is concerned with 'testimonial' hearsay." *Berrios*, 676 F.3d at 125 (citing *Crawford*, 541 U.S. at 51). The Third Circuit further remarked that, in subsequent decisions, the Supreme Court has held, "without qualification that the Confrontation Clause protects the defendant *only* against the introduction of testimonial hearsay statements, and that admissibility of nontestimonial hearsay is governed solely by the rules of evidence." *Berrios*, 676 F.3d at 126 (emphasis in original) (citations omitted).

Testimonial statements for Confrontation Clause purposes include statements a declarant made with an intent to incriminate, statements made with the anticipation that the person to whom the declarant made the statement would be called to testify, formal statements under oath, and statements made in response to law enforcement interrogation seeking information about a past event. *See Michigan v. Bryant*, --- U.S. ----, 131 S.Ct. 1143, 1162, 179 L.Ed.2d 93 (2011); *Davis*, 547 U.S. at 822; *Waller v. Varano*, 562 F. App'x 91, 92, fn. 1 & 2 (3d Cir. 2014).

Referring to *Bruton*, the Third Circuit observed that, to determine if there is a violation of the Confrontation Clause, courts must employ a two-step process. "First, a court should determine whether the contested statement by an out-of-court declarant qualifies as testimonial.... Second, the court should apply the appropriate safeguard. If the absent witness's statement is testimonial, then the Confrontation Clause requires unavailability and a prior opportunity for cross-examination.... If the statement is nontestimonial, then admissibility is governed solely by the rules of evidence." *Berrios*, 676 F.3d at 127 (internal quotation marks, citation, and footnote omitted).

In this case, Vasquez-Uribe's Confrontation Clause claim fails the first consideration as it plainly was not testimonial in nature. "Testimonial" statements under the Confrontation Clause are those made by "witnesses" who "bear testimony," such as by making a "formal statement to government officers," and are not statements made casually to acquaintances. *Crawford*, 541 U.S. at 51–52 (identifying as the core class of testimonial statements "ex parte in-court testimony," "extrajudicial statements," and "statements ... made under circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"); *see also Bryant*, 131 S.Ct. at 1162; *Davis*, 547 U.S. at 822; *Berrios*, 676 F.3d at 128. Thus, this Court has little hesitation in concluding that Toro's testimony regarding certain statements

that Gil made to him on February 8, 2001 was not testimonial, and thus not subject to Confrontation Clause scrutiny.

This Court likewise finds that the contested "hearsay" statements here bear none of the characteristics generally exhibited by testimonial statements. There is no indication that Gil held the objective of incriminating Vasquez-Uribe at the time the subject statements were made on February 8, 2001. Further, there is no indication that Gil and Toro were aware of being overheard.

Moreover, under the second step, this Court finds, as discussed above, that the non-testimonial hearsay statements attributed to Gil were plainly admissible under Fed.R.Evid. 801(d)(2)(E), as statements made by co-conspirators during and in furtherance of the conspiracy. "[N]o independent inquiry into reliability is required when the evidence 'falls within a firmly rooted hearsay exception,'" and "the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that ... a court need not independently inquire into the reliability of such statements." *Bourjaily v. United States*, 483 U.S. 171, 183 (1987) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)).

Therefore, this Court concludes that the rights of Vasquez-Uribe under the Confrontation Clause of the Sixth Amendment were not violated, and that Toro's testimony regarding Gil's non-testimonial statements were plainly admissible under Fed.R.Evid. 801(d)(2)(E).

C. Request for an Evidentiary Hearing

Finally, this Court denies Petitioner's request for an evidentiary hearing with regard to his ineffective assistance of counsel claims. As fully explained in this Court's preceding discussion regarding Petitioner's several claims for relief, the trial record in this case adequately provides this Court with the factual basis necessary to show conclusively that Vasquez-Uribe is not entitled to

18

relief on his claims of ineffective assistance of counsel concerning the failure to call Gil and Taylor as witnesses at trial or object to Toro's testimony as violative of the Confrontation Clause.

## **CERTIFICATE OF APPEALABILITY**

For the reasons discussed above, this Court denies a certificate of appealability because Petitioner has not demonstrated "a substantial showing of the denial of a constitutional right" as required under 28 U.S.C. § 2253(c)(2).  *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

## **CONCLUSION**

For the reasons set forth above, this Court DENIES Petitioner's Motion (ECF No. 1) and DECLINES to issue a certificate of appealability.   An appropriate Order follows.


                    s/Susan D. Wigenton
                    United State District Judge